# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **DONNA J. BELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv2109 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Donna J. Bell's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income benefits (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the Court, see 28 U.S.C. § 636(c), for a final disposition. Ms. Bell has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Donna J. Bell (Plaintiff) applied for DIB and SSI in December 2006, alleging a disability since February 1, 2006, caused by deep vein thrombosis (DVT) in her right calf, high blood pressure, degenerative arthritis in her spine, and a fibroid tumor in her uterus. (R.[1] at 56-63.) Her applications were denied initially and after a hearing in May 2008

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

before Administrative Law Judge (ALJ) Joseph W. Warzycki.  (Id. at 8-26, 398-450.)  The Appeals Council denied her request for review, effectively adopting the decision of the ALJ as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Vincent Stock, M.A., a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then 47 years old, divorced, and staying with a friend in a one-story house.  (Id. at 402-03.)  She has two children; both are adults.  (Id. at 403.)  She is right-handed, 5 feet 2 inches tall, and weighs 165 pounds.  (Id. at 402.)  She has a driver's license and last drove approximately two weeks earlier.  (Id. at 403.)  She left school midway through the eleventh grade and has since obtained a General Equivalency Degree (GED).  (Id. at 404-05.)  She went to a technical college for two years and received a degree as a micro-computer specialist.  (Id. at 405.)  She had had a certified nurse's aide license but let it expire.  (Id.)  She has no income and is living on food stamps.  (Id. at 404.)  She had received unemployment benefits for six months beginning in May 2006.  (Id.)  )

Plaintiff last worked in May 2006.  (Id. at 406.)  At that time, she was working part-time as a cashier at a service station.  (Id. at 406-07.)  They made accommodations for her back problems by allowing her to work the midnight shift and having a cot for her to lie down on.  (Id. at 407.)

On February 1, 2006, she "slipped a disc in her back."  (Id.)  She went to see a chiropractor a few weeks later.  (Id.)  The chiropractor took x-rays, sent them to a friend,

and came back with a diagnosis of spondylolysis.  (<u>Id.</u> at 407-08.)  The chiropractor told her she could not work because she had to bend to pick up ice and had to reach over her head and there was no one to at work to do such tasks for her.  (<u>Id.</u> at 408.)  In April 2006, she was told not to lift anything over ten pounds, bend, or stoop.  (<u>Id.</u> at 410.)  In May, she was sexually harassed by the manager and quit.  (<u>Id.</u>)  She applied for, and received, unemployment benefits.  (<u>Id.</u>)  In November, she was diagnosed with DVT in her right leg.  (<u>Id.</u> at 411.)  She was hospitalized and given blood thinners.  (<u>Id.</u>)  She has to take one, Coumadin, for the rest of her life.  (<u>Id.</u>)  Once a month, she has to have the Coumadin levels checked; this takes approximately two hours.  (<u>Id.</u> at 439.)  Her leg is always painful.  (<u>Id.</u> at 411, 442.)  If she sits, walks, or stands too long, her leg swells.  (<u>Id.</u>)

She has also been diagnosed with gastroesophageal reflux disease (GERD).  (<u>Id.</u> at 412.)  When she has a GERD attack, she feels like she is having a heart attack.  (<u>Id.</u> at 441.)  The only way to lessen the pain is to lie down and eat Tums.  (<u>Id.</u>)

Plaintiff still has restrictions.  (<u>Id.</u>)  Specifically, she cannot lift more than ten pounds and cannot bend forward or crouch.  (<u>Id.</u> at 412-13.)

Plaintiff recently met with a Vocational Rehabilitation counselor to comply with food stamp regulations.  (<u>Id.</u> at 414.)  The counselor told her he could not help her until her doctor released her.  (<u>Id.</u> at 415.)  Her doctor told her she was not permitted by the hospital to give any disability letters to anyone.  (<u>Id.</u> at 415-16.)

Plaintiff has looked for work, including office work and pet sitting.  (<u>Id.</u> at 416-17.)  She can not do any job that requires lifting.  (<u>Id.</u> at 417.)  She cannot lift her forty-pound,

two-year old grandchild.  (Id.)  The problem with office work is that she has to get up every hour and walk for approximately twenty minutes.  (Id. at 418.)

Asked to describe her day, Plaintiff testified that she gets up, takes her medicine, figures out what she is going to eat (she does most of her own cooking), eats, checks her email, lies down and watches television for an hour, gets up and walks around the house because her doctor has told her to stay active, lies down and watches television in the afternoon, eats her evening meal, uses the computer, walks around, and then lies down.  (Id. at 423, 425-26.)  Sometimes she is able to do the laundry.  (Id. at 423.)  It is hard for her to stand.  (Id. at 424.)  The person she lives with loads the dishwasher and does the household chores of vacuuming, mopping, and sweeping.  (Id.)  She has to walk slowly when she goes grocery shopping.  (Id.)  She spends three-fourths of her day lying down.  (Id. at 441.)  When she does, she has to elevate her feet.  (Id.)  She talks to her daughter on the telephone; her son is in the military.  (Id. at 427.)

In addition to the Coumadin, Plaintiff takes Divan, Metformin, and Avantra.  (Id. at 429.)  The last is for her asthma.  (Id.)  She takes two puffs a day.  (Id.)  She has had asthma a long time.  (Id. at 430.)  She is allergic to almonds and reacts to dust, mold, cleaning agents, and any strong smells.  (Id. at 430-31.)  An asthma attack is usually seasonal or caused by allergies.  (Id. at 431.)  The Divan is for high blood pressure.  (Id. at 431-32.)  Her blood pressure was not under control for awhile because she could not afford the medication.  (Id. at 432.)  Metformin is for diabetes.  (Id.)  She was referred to a nutritionist, is on a diet, and checks her blood sugar levels three times a day.  (Id. at 433.)  Her levels

are usually out of control. (Id.) Her doctor has told her she will consider insulin therapy if her levels do not go down. (Id. at 433-34.) Plaintiff thinks the problems she is having with numbness in her hands and feet are due to the diabetes. (Id. at 438-39.) She also has a problem with incontinence, and it is getting worse. (Id. at 439.) She's been told she still has the DVT in her right leg. (Id. at 434.) She has been told to take Tylenol Arthritis for her pain because her doctor thinks the other pain relievers may have contributed to her GERD. (Id. at 435.) Everyday, her pain is a five on a ten-point scale. (Id.)

The longest period she can sit comfortably for is 30 to 45 minutes. (Id. at 437.) The longest she can stand or walk for is 20 minutes. (Id.) She cannot lift anything heavier than ten pounds. (Id.) She has difficulty climbing stairs. (Id.)

Plaintiff is not sure if she suffers from depression. (Id. at 436.)

She quit smoking and does not drink. (Id. at 429.)

Mr. Stock testified as a VE. The ALJ asked him if the following-described hypothetical person would have transferable work skills.

> Please assume a person the age of 47 with a GED education and past relevant work [described earlier by the VE]. Please assume I would find this person capable of performing the exertional demands of sedentary work as defined in the Social Security regulations.[2] Specifically as [sic] person could lift, carry, push, pull ten pounds occasionally, less than ten pounds frequently. Sit for six, stand/walk for two for a total of eight out of eight. The person would require a sit/stand option during the day. The person could occasionally climb, balance, stoop, crouch, knee, or crawl. The person should not be exposed to ladders, ropes, scaffolds, moving machinery,

---

[2]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

unprotected heights.  No concentrated exposure to dust, fumes, gases, chemicals.

(Id. at 446.) (Footnote added.)  The VE replied that Plaintiff's past relevant work was "out of the question."  (Id. at 447.)  Such a person could, however, work as a cashier with a sit/stand option, or do a semi-conductor bench job, also with a sit/stand option.  (Id. at 447-48.)  These jobs existed in significant numbers in the state and national economies.  (Id.)

The VE further testified that his evidence did not conflict with the Dictionary of Occupational Titles (DOT) or The Selected Characteristics of Occupations (SCO).  (Id. at 448.)

In response to a question by Plaintiff's counsel, the VE stated that the industry standard for absenteeism is two days a month.  (Id.)  The sit/stand option does not allow for elevating one's feet.  (Id. at 449.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and an assessment of her physical residual capacity.

When applying for SSI and DIB, Plaintiff completed a Disability Report, listing her height as 5 feet 2 inches and her weight as 172 pounds.  (Id. at 107[3], 142.)  Her ability to work is limited by her DVT, high blood pressure, asthma, degenerative arthritis in her spine, and a fibroid tumor on her uterus.  (Id. at 108.)  These impairments first bothered her in

_____

[3]A duplicate report appears at pages 142 to 150, inclusive.

January 2006 and prevented her from working the following month.  (Id. at 108)  She

stopped working on May 31, 2006.  (Id.)  She obtained a GED in 1982 and studied to be a

micro-computer specialist in 1994.  (Id. at 114-15.)

Plaintiff also completed a Function Report.  (Id. at 83-90.)  Asked to describe what

she does during her waking hours, she responded that she takes a bath, eats breakfast, loads

the dishes in the dishwasher, and lies on the couch with her legs elevated.  (Id. at 83.)  She

can sit for no longer than forty-five minutes before her right leg becomes swollen and

painful.  (Id.)  She cannot sleep if she is in pain.  (Id. at 84.)  She sometimes has to be

reminded to take her medications.  (Id. at 85.)  She cannot stand long enough to make

dinner; the friend she lives with makes it or they order take-out.  (Id.)  Before her

impairments, she cooked and baked every day.  (Id.)  If a task requires bending, someone

has to do it for her.  (Id.)  She does not have any problems getting along with other people

but cannot go out unless it is for short distances.  (Id. at 88.)  Her impairments affect her

abilities to lift, squat, bend, stand, walk, sit, kneel, and climb stairs.  (Id.)  These activities

are painful.  (Id.)  She cannot walk farther than fifty feet without having to stop and rest for

approximately fifteen minutes.  (Id.)  She can pay attention as long as necessary.  (Id.)  She

follows written and spoken instructions well and also gets along well with authority figures.

(Id. at 88-89.)  She handles stress and changes in routine well.  (Id. at 89.)  If she stays up

too long, she feels sick and dizzy.  (Id. at 90.)  Because of her medication, she bruises

easily.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications.  (Id. at 128-34.)  In February 2007, she was diagnosed with diabetes.  (Id. at 129.)  She needed to be reminded to take medication.  (Id. at 132.)

Plaintiff's earnings report covered the years from 1976 through 2006, inclusive.  (Id. at 69.)  She had no earnings in 1993.  (Id.)  Her annual earnings ranged from a low of $131.10, in 1977, to a high of $19,055.57, in 2000.  (Id.)  In all but six years, her annual earnings did not exceed $10,000.00.  (Id.)  In her thirty years of working, she had thirty-seven employers.  (Id. at 70-77.)

The relevant medical records before the ALJ are summarized below in chronological order.

Plaintiff first consulted Gary Vickers, D.O., with Mercy Medical Group (Mercy), on November 18, 2003, about atypical substernal chest pain lasting for ninety minutes.  (Id. at 161.)  She was anxious and under a lot of stress, having lost two siblings recently.  (Id.)  Her anxiety was thought to be situational.  (Id.)  She was to undergo a stress thallium test and various blood tests.  (Id.)  Five days later, Plaintiff returned and was told she was hypertriglyceridemia and needed to change her diet and to exercise.  (Id. at 161, 154.)  It was noted that she had had no further episodes of chest pain and had not had the stress test performed yet.  (Id. at 161.)

Plaintiff saw Dr. Vickers again on December 22 about a cough, congestion, wheezing, and sinus drainage.  (Id. at 160.)  It was noted that she had a history of asthma.

(Id.)  Plaintiff was diagnosed with bronchitis, prescribed an antibiotic, and told to use a humidifier in her bedroom.  (Id.)

In February 2004, Plaintiff saw Dr. Vickers for complaints of right shoulder discomfort after slipping and falling.  (Id. at 160.)  An x-ray taken at the emergency room was negative.  (Id.)  She was diagnosed with a right shoulder strain, prescribed medication, and told to do stretching exercises.  (Id.)  It was noted that her blood pressure was slightly elevated.  (Id.)  She was to return in six weeks to have her pressure checked again in case the elevation was not attributable to her shoulder pain.  (Id.)  She did not show for the follow-up visit.  (Id. at 158.)

Plaintiff returned to Dr. Vickers in May with complaints of right jaw discomfort. (Id. at 160.)  She thought she might have an abscessed tooth and was trying to get an appointment with a dentist.  (Id.)  It was recommended that she do so as quickly as possible. (Id.)

Complaining of pain in the right side of her abdomen for the past week that was getting progressively worse, Plaintiff went to the emergency room at St. John's Mercy Medical Center (St. John's) in April 2005.  (Id. at 224-31, 273.)  The pain was provoked by lifting, coughing, and breathing and alleviated by laying down.  (Id. at 225.)  A computed tomography (CT) scan of her abdomen and pelvis revealed a large, probably fibroid, mass in her uterus.  (Id. at 231, 273.)  Plaintiff was given pain relief medication and discharged. (Id. at 227.)

Two days later, Plaintiff saw a physician at the JFK Clinic. (Id. at 250-51.) Her abdominal pain was still present. (Id. at 250.) Her uterine fibroid was described as an "old problem." (Id.) Plaintiff was urged to check her blood pressure at home and to make an appointment with her primary care physician. (Id. at 251.) An ultrasound of her abdomen was to be obtained. (Id.) It was, and was normal. (Id. at 251, 270-71, 274.)

Two weeks later, Plaintiff returned, reporting that she had had abdominal pain and diarrhea for the past three weeks and chest pain since that morning, although the diarrhea had resolved when she went on a bananas, rice cereal, applesauce, and toast diet.. (Id. at 252.) Her abdominal pain did not seem to be associated with eating or activity. (Id.) The chest pain was sharp and radiated to her back between her shoulder blades. (Id.) It did not lessen with rest and was not associated with any other symptoms. (Id.) The physician opined that the chest pain might be caused by GERD and prescribed Prevacid. (Id.) A coronary event was not likely given the normal results of her cardiac catherization the year before.[4] (Id.) The abdominal pain was thought to be costochrondritis[5] given the negative test results. (Id.)

Plaintiff returned to the St. John's emergency room on May 12 with complaints of a cough and congestion for a few days and shortness of breath since that morning. (Id. at

_____

[4] The records of that catherization were not before the ALJ.

[5] costochrondritis is inflammation of one or more of the cartilages between the ribs. Stedman's Medical Dictionary, 403 (26th ed. 1995).

232-38, 272.)  Although she frequently used her inhaler, she felt she could not catch her breath.  (Id. at 235.)  A chest x-ray showed no acute disease.  (Id. at 238, 272.)

Plaintiff returned to the JFK Clinic on June 2 with complaints of back pain on her right side, occasionally radiating to her ankle, present since December 2004, and gradually worsening.  (Id. at 253.)  On a ten-point scale, the pain was a nine.  (Id.)  The pain was thought to be arthritic.  (Id.)  Exercises and Tylenol Arthritis, to be taken as needed, were suggested.  (Id.)

On June 14, Plaintiff informed the physician at the JFK Clinic that she wanted a hysterectomy.  (Id. at 254.)  An endometrial biopsy was planned, following which she would have the hysterectomy, which was to be performed on July 5.  (Id. at 254-55.)

Again complaining of shortness of breath and additionally of chest pain, Plaintiff went the St. John's emergency room on June 30.  (Id. at 239-49, 258-59.)  She had bronchitis and her blood pressure was elevated.  (Id. at 240.)  She was given nitroglycerin and a stress test.  (Id. at 242, 245, 249.)  She also had an x-ray and CT scan of her chest, neither of which showed any abnormality.  (Id. at 246-47.)  The low level stress test was also normal.  (Id. at 249, 258-59.)

A July stress test failed to induce ischemia and revealed a normal myocardial perfusion pattern at stress and rest and a normal wall motion of all left ventricular segments.  (Id. at 183-84, 264-67.)  There was no chest pain.  (Id. at 184.)

Plaintiff saw Tobin Lingafelter, D.C., in March, 2006, for pain in her lower back and right hip and numbness in her right leg and foot.  (Id. at 167, 170-73.)  She had had these

problems for six weeks after slipping on a patch of mud.  (Id. at 167.)  Her lumbar range of motion was limited.  (Id. at 172.)  The range had slightly improved two weeks later, but was as restricted at the next two visits as it had been at the first.  (Id. at 174-79.)  An x-ray of her lumbar spine taken on March 26, between Plaintiff's seventeenth and eighteenth chiropractic treatments, revealed Grade I degenerative spondylolisthesis[6] of L5 on L5, but no evidence of fracture or dislocation.  (Id. at 169.)  An examination and review of the x-ray by Peter Mirkin, M.C., revealed that she walked with a limp, had a range of motion in her lumbar spine that was 80% of normal, was able to heel and toe walk, had difficulty squatting and rising from a squat position, had a minimally positive reaction to straight leg raising[7] on the right, and had intact deep tendon reflexes.  (Id. at 168.)  Dr. Mirkin opined that Plaintiff had developed some radiculopathy after slipping.  (Id.)  He recommended a magnetic resonance imaging (MRI) be obtained.  (Id.)  At her twenty-third visit, she was referred to an orthopedist.  (Id. at 181.)  At her twenty-sixth visit, she reported feeling better.  (Id. at 181.)  Plaintiff stopped treatment after twenty-eight treatments.  (Id.)

In May, shortly before Plaintiff's last chiropractic treatment, she went to the emergency room at St. John's after the chest pains and shortness of breath she had been experiencing for two days became more intense.  (Id. at 186-93.)  An electrocardiogram

---

[6]Spondylolisthesis is "[f]orward movement of the body of one of he lower lumbar vertebrae on the vertebra below it, or upon the sacrum."  Stedman's Medical Dictionary at 1656.

[7]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

(ECG) and x-ray were taken, neither of which revealed any acute disease. (Id. at 187, 191-93.) Medication was given intravenously; oxygen was administered. (Id. at 187.) Plaintiff was discharged within four hours. (Id. at 188.)

Plaintiff returned to St. John's on November 13 with complaints of right leg pain for the past nine days beginning after she was doing "the bunny hop dance." (Id. at 194-213, 312-13.) An ultrasound showed acute DVT. (Id. at 195.) On examination, she was alert and oriented times three and was in no apparent distress. (Id. at 198.) She was given an anticoagulant. (Id.) Her leg was elevated. (Id.) On discharge the next day, she was to do such activity as she could tolerate. (Id. at 195.) Her medications included the previously-prescribed medications of Diovan/HCT, for high blood pressure, and Albuterol, for asthma, and the newly-prescribed medications of Coumadin and Lovenox. (Id.) She was also instructed on how to stop smoking; she had been smoking a pack of cigarettes a day for thirty years. (Id. at 196, 197.)

Two days later, Plaintiff returned to the emergency room at St. John's with complaints of chest pain unaccompanied by shortness of breath. (Id. at 214-23.) She had not taken her high blood pressure medication that day. (Id. at 216.) An ECG and CT scan of her chest were normal. (Id. at 221 223.) Plaintiff was discharged within four hours. (Id. at 216.)

The following week, Plaintiff went to the JFK Clinic for treatment of her acute DVT, asthma, and hypertension. (Id. at 260-61.) She was still taking the Lovenox and was to

have her blood tested to see if her International Normalized Ratio (INR)[8] was low enough, approximately 2.5, that she could stop using it, was such that she should continue with the current dose, or was high and she should increase the dose.  (Id. at 260.)  She was started on Flovent for her asthma and was given a prescription for Diovan for her hypertension. (Id.)  A November 24th venous duplex exam of Plaintiff's left lower extremity revealed no evidence of DVT or superficial phlebitis.  (Id. at 185, 311.)

On December 4, it was noted that she had yet to have the prescription for Diovan filled.  (Id. at 262.)  She was to be tested for a factor V Leiden mutation.[9]  (Id.)  She had been having heavy menstrual bleeding for two days and was told to stop taking the Lovenox and continue taking the Coumadin.  (Id. at 262-63.)  She called on December 15 to report right calf pain and burning up to her knee and thigh.  (Id. at 263.)  She had missed her five milligrams dosage of Coumadin the day before and had taken a seven milligram dosage that day.  (Id.)

Plaintiff returned to the JFK Clinic on February 8, 2007, with complaints of pain in her right shin and, sometimes, in her calf.  (Id. at 296-300, 305-08.)  There was no evidence of chest pain, shortness of breath, swelling, or erythema (redness).  (Id. at 296.)  Her INR

---

[8]The INR "is used to monitor the effectiveness of blood thinning drugs" and is regularly checked.  Lab Tests Online, PT and INR, http://www.labtestsonline.org/understanding/ analytes/pt/test.html (last visited Mar. 3, 2011).

[9]People with a factor V Leiden mutation have "a higher than average risk" of developing DVT.  National Institute of Health, Factor V Ledien thrombophilia, http://ghr.nlm.nih.gov/ condition/factor-v-leiden-thrombophilia (last visited Mar. 7, 2011).  Although this factor increases the risk, "only about 10 percent of individuals with the factor V Leiden mutation ever develop abnormal clots."  Id.  Smoking increases the risk.  Id.

was 2.4  (Id.)  She was continued on her current dosage of Coumadin and was told to wear compression stockings.  (Id.)

Two weeks later, Plaintiff returned to the JFK Clinic having been newly diagnosed with diabetes.  (Id. at 291-93.)  She was placed on Metformin, instructed on how to check her blood sugar levels, told to follow a diabetic diet, and permitted to walk ten minutes a day.  (Id. at 291-92.)

Plaintiff's primary complaint when she returned to the JFK Clinic on March 29 was of right calf pain.  (Id. at 282-91.)  She reported that her calf hurt if she walked a distance. (Id. at 282.)  She also had urinary incontinence and reported that she had had it for a long time.[10]  (Id.)  It was noted that she drank caffeinated beverages in the morning and evening. (Id.)  It was also noted that she had only needed her inhaler for asthma twice in the past month.  (Id. at 283.)  She complained of headaches which occasionally caused nausea, required that she lie down, and were relieved by ibuprofen.  (Id. at 285.)  She had right-sided back pain.  (Id. at 287.)  On examination, she was in no apparent distress.  (Id.)  Her current medications were continued.  (Id. at 290.)

Plaintiff had stopped smoking when she saw Dr. Savedra at the JFK Clinic on May 24.  (Id. at 302-03, 324, 327-29.)  Her only complaint was of continuing pain in both calves, although an ultrasound of her left calf had showed no sign of DVT.  (Id. at 302, 329.)

---

[10]Plaintiff refers in her brief to the resident, Dr. Heather Savedra, "confirm[ing]" that Plaintiff had suffered from stress incontinence for a long time.  (Brief at 4.)  The notes of the visit clearly indicate that Dr. Savedra was merely recording Plaintiff's complaints of such.

Plaintiff informed a nurse a the JFK Clinic on August 23 that she was not in pain. (Id. at 330.) Six days later, an ultrasound of Plaintiff's abdomen was performed to investigate the cause of her abdominal pain and diarrhea. (Id. at 325-26.) It was negative. (Id. at 325.)

On October 12, Plaintiff again informed a nurse at the JFK Clinic that she was not in pain. (Id. at 319.) There is no indication of why she visited the clinic. (Id.)

Complaining of dental pain, Plaintiff returned to the JFK Clinic on December 6. (Id. at 316-18.) She was given a referral to a oral surgeon. (Id. at 318.)

When Plaintiff next went to the JFK Clinic, on March 13, 2008, she complained of sinus congestion, diarrhea, headaches, and tooth pain. (Id. at 367-68.) She had not taken her blood pressure medication that morning. (Id. at 368.) Plaintiff's dosage of Metformin was increased. (Id. at 365.)

On April 17, Plaintiff reported to the nurse at JFK Clinic that she had had chest pain, left arm numbness, shortness of breath, and nausea the night before that were gone when she woke up. (Id. at 362-64.) She was also to have a tooth extracted and wanted to know if she could go off Coumadin for three days prior as instructed by the surgeon. (Id. at 363.)

Four days later, Plaintiff returned to St. John's emergency room with complaints of chest pain that had worsened during the past two days and had not been alleviated by a friend's nitroglycerin. (Id. at 331-57.) Her pain was a seven on a ten-point scale. (Id. at 339.) She reported that she had been disabled since May 2006. (Id. at 354.) She had quit smoking. (Id. at 354-55.) An ECG was performed and was unremarkable, as were

laboratory tests and a chest x-ray. (Id. at 336-38, 350, 357.) Nitroglycerin paste applied to her chest wall alleviated her pain. (Id. at 341.) Three hours later, she was asymptomatic, watching televison, and ordering lunch. (Id.) She was discharged the next day with a diagnosis of non-cardiac chest pain and stable asthma, hypertension, diabetes, and history of DVT. (Id. at 349.) Her INR at discharge was 7.7. (Id.) The doctor, Jordan Freie, M.D., told Plaintiff that the most likely cause of her chest pain was musculoskeletal, anxiety, or, possibly, reflux. (Id. at 350.) She dismissed the last suggested cause as the symptoms did not remind her of her previous reflux problems. (Id.)

The following month, on May 8, Plaintiff complained of dull, sporadic chest discomfort to a nurse at the JFK Clinic. (Id. at 359-61.) She also complained of pain in her left heel. (Id. at 360.) The foot was to be x-rayed. (Id.) Her diabetes and hypertension were described as stable. (Id.) She was placed on an over-the-counter GERD medication. (Id. at 359.)

The ALJ also had before him the report of an assessment by a non-examining, non-medical consultant and documents relating to Plaintiff's pursuit of vocational rehabilitation..

In February 2007, a Physical Residual Functional Capacity Assessment (PRFCA) was completed as part of the application review process. (Id. at 275-80.) The primary diagnosis, and only, diagnosis was spondylosis. (Id. at 275.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 276.) Her ability to push or pull was unlimited other than these lifting and

carrying restrictions.  (Id.)  She had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 277-79.)

A counselor with the State of Missouri Division of Vocational Rehabilitation wrote Plaintiff in February 2008 that the Division was ready to assist her "in planning for services [she] may need to achieve a positive employment outcome."  (Id. at 65.)

The next month, a Career Assessment Inventory profile and personality interpretative report were prepared for Plaintiff.  (Id. at 372-97.)

## The ALJ's Decision

Following the Commissioner's five-step evaluation process, the ALJ first found that Plaintiff had not engaged in substantial gainful activity at any time after her alleged disability onset date of February 1, 2006.  (Id. at 12-13.)  The ALJ next found that Plaintiff had spondylosis at L4-L5, DVT of the right lower extremity, Type II diabetes mellitus, hypertension, asthma, seasonal allergies, and probable GERD, but did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id. at 13-14, 17.)  With her impairments, she could not return to her past relevant work.  (Id. at 14.)  She could, however, perform sedentary work[11] that did not require (a) climbing of ropes, ladders, or scaffolds; (b) more than occasional balancing, stooping, kneeling, crouching, crawling or climbing of ramps and stairs; and (c) concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high

_____

[11]See note 2, supra.

humidity, dampness, atmospheric irritants, pollutants, or other typical allergens. (Id. at 15.) With these limitations and capabilities, Plaintiff could, according to the VE, work as an unskilled cashier or perform wafer semi-conductor jobs. (Id.)

Noting that Plaintiff could not perform either job and would be unemployable if she had to be absent from work two or more days a month due to medical problems, would require more than normal rest breaks two or thee times week, and needed to elevate her feet most of the time, the ALJ found that these limitations were not valid or justified. (Id.) He noted that Plaintiff had not had any real treatment for her degenerative disc disease since April 2006 other than taking over-the-counter medication; her DVT was stable and there were no documented prescriptions for elevating the leg or for restricting lifting; her diabetes, hypertension, and GERD were well-controlled; and there was no documented evidence of frequent incontinence or of cardiac-based chest pain. (Id.) The ALJ further noted that no doctor had placed any long-term limitations on Plaintiff's abilities to sit, walk, bend, lift, carry, or perform another exertional activity that were more restrictive than included in his hypothetical question to the VE, nor did any doctor imply or state that Plaintiff was disabled or incapacitated. (Id. at 16.) Plaintiff had not had any surgery or extended inpatient hospitalizations, had not been referred for physical therapy or to a pain clinic or specialist, had not had any side effects from her medications, and did not have most of the signs typically associated with chronic, severe musculoskeletal pain, e.g., muscle atrophy or frequent, persistent, and recurring spasms. (Id.) Insofar as Plaintiff's daily activities were restricted, they were so more by her choice than by "any apparent

medical proscription." (Id.) The ALJ also noted that Plaintiff had accepted unemployment benefits and had ended her last job because of "presumed sexual harassment." (Id. at 13, 16.)

Because Plaintiff could perform other jobs, she was not disabled within the meaning of the Act. (Id. at 18.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a

severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The

need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet his burden by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997).  "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'"  **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case

in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred when (1) finding she could perform the jobs described by the VE because the hypothetical person did not have a restriction included in the ALJ's RFC finding and (2) considering the absence of an opinion by any health care provider, including the physician at the JFK Clinic, Dr. Savedra, that she is disabled or incapacitated because (a) the absence is not to be considered as supporting a finding of not disabled, (b) Dr. Savedra also did not say that Plaintiff could engage in full-time employment, and (c) the ALJ failed in his duty to fully and fairly develop the record by not contacting Dr. Savedra to express an opinion on her functional limitations.

Plaintiff correctly notes that the ALJ's hypothetical question to the VE included an qualification that the person could not tolerate any concentrated exposure to dust, fumes, gases, or chemicals and that the ALJ's RFC findings included a need to avoid concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity, dampness, atmospheric irritants, pollutants, or other typical allergens. The latter includes "temperature extremes, high humidity, dampness"; the former does not. The question is whether this is a distinction without a difference. The Commissioner argues that it is. The Court agrees.

Social Security Ruling 96-9p provides, in relevant part:

An "environmental restriction" is an impairment-caused need to avoid an environmental condition in a workplace. Definitions for various workplace environmental conditions are found in the SCO; e.g., "extreme cold" is exposure to nonweather-related cold temperatures. In general, *few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards*. The "hazards" defined in the SCO are considered unusual in unskilled sedentary work. They include: moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals. *Even a need to avoid all exposure to these conditions would not, by itself, result in a significant erosion of the occupational base*.

Policy Interpretation Ruling Titles II and XVI, Social Security Ruling 96-9p, 1996 WL 374185, *8-9 (S.S.A. July 2, 1996) (emphasis added). See also **Ely v. Astrue**, 2009 WL 5214902, *4 (W.D. Mo. Dec. 29, 2009) (citing SSR 96-9p when finding that nonexertional environmental limitations such as the ones found by the ALJ in the instant case did not curtail the claimant's ability to perform unskilled sedentary work). This observation is reflected in the requirements outlined in the DOT for the two jobs cited by the VE. Specifically, the cashier position does not require exposure to weather, extreme cold or heat, dampness, humidity, or other atmospheric condition. See DOT, 211.462-026 (4th ed. 1991). The semi-conductor bench job also requires none of these environmental exposures. See Id., 726.687-046.

Plaintiff also challenges the ALJ's seeming reliance on the silence of her health care providers about whether she is disabled and whether she has any functional limitations as violating his duty to fully and fairly develop the record.

"'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir.2004)); however, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped,'" **id.** (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).  In the instant case, a crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff.  See e.g. **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

The majority of the Plaintiff's relevant medical care was given either at the St. John's emergency room or by a health care provider, including, but not limited to, Dr. Savedra, at the JFK Clinic.  The lack of any functional restrictions placed on her by any of the physicians who treated her at either the emergency room or the clinic was properly considered by the ALJ.  See **Young v. Apfel**, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work."[12]).  The ALJ did not err in not soliciting an opinion by one of Plaintiff's

---

[12]This lack of any opinion of disability distinguishes this case from the case relied on Plaintiff. In **Lauer v. Apfel**, 245 F.3d 700, 705 (8th Cir. 2001), the ALJ was found to have erred by considering the lack of any opinion of disability by the claimant's first treating psychiatrist.  In that case, however, there was an opinion of disability by the claimant's current treating psychiatrist and by a licensed psychologist.  It was an inconsistency in opinions of health care providers, not the lack of *any* opinion, that was also the basis for the reversal in **Pate-Fires v. Astrue**, 564 F.3d 935, 943 (8th Cir. 2009).

doctors.  And, his unfavorable resolution of Plaintiff's applications is supported by substantial evidence, including the medical records that reflect that Plaintiff's impairments were stable when she took her prescribed medication, including her diabetes and hypertension.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."  **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of March, 2011.